

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHANIYA WILLIAMS,

                            Plaintiff,

                - against -

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.

13 Civ. 5326(VB)(PED)

REPORT AND
RECOMMENDATION

TO:    THE HONORABLE VINCENT L. BRICCETTI
       UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

Plaintiff Shaniya Williams ("Plaintiff" or "Williams"), proceeding *pro se*, brings this

action on behalf of QEB, her minor child, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3),

challenging the final determination of the Commissioner of Social Security (the "Commissioner"

or "Defendant") that QEB is not eligible for Social Security Income ("SSI") benefits under the

Social Security Act (the "Act").  The matter comes before the undersigned pursuant to an Order

of Reference dated August 2, 2013.  Dkt. 5.  Presently before the Court is the Commissioner's

motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure.  Dkts. 13 (Def.'s Notice of Mot.), 14 (Def.'s Mem. of Law in Supp. of Def.'s Mot. for

J. on the Pleadings ("Def.'s Mem.").  For the reasons set forth below, I respectfully recommend

that Defendant's motion be **DENIED** and the case **REMANDED** pursuant to 42 U.S.C. §

405(g), sentence four, for further administrative proceedings.[1]

---

[1] "Although a remand request is normally made by a party, there is no reason why a court
may not order the remand *sua sponte*."  Clark v. Callahan, No. 96 Civ. 3020(SAS), 1998 WL
512956, at *1 (S.D.N.Y. Aug. 17, 1998) (internal quotation marks omitted).  Copies of

## II. BACKGROUND

### A. Application for SSI

QEB was born on October 3, 2003 and in first grade at the time Plaintiff applied for SSI on his behalf. R. 70, 100.[2]  Plaintiff's December 21, 2010 application states that QEB's disability began on October 1, 2006. R. 70.[3]  Plaintiff reported that QEB's impairment, among other things, affects his behavior with other people, and noted that her son generally does not get along with adults or teachers and cannot play team sports. R. 90.  She also reported that his impairment affects his ability to help himself; cooperate; take care of his personal needs; and limits his ability to pay attention and accomplish tasks. R. 91–92.  She noted that QEB cannot use a zipper by himself; select or hang up his clothes; eat with utensils; help out around the house with chores; obey safety rules; accept criticism; get to school on time; keep busy on his own; finish things he starts; work on arts and craft projects; or complete his homework. R. 91–92.  She stated that QEB "has to be constantly reminded to remember to do anything." R. 91.  She also reported that QEB "urinates on himself even in school." R. 91.  She stated that when QEB "gets around other children . . . someone gets hurt," and she noted that QEB "always fight [*sic*] or hurts [other siblings] as if it's a game." R. 103.  She reported that his behavior "excludes him from class party's [*sic*], trips, plays and extracurricular activities," and that QEB "tr[ies] to hurt himself by picking 'old' cuts," throws tantrums, fits, and cry often. R. 103.

unreported cases will be mailed to the *pro se* plaintiff.  See Lebron v. Sanders, 557 F.3d 76 (2d Cir. 2009).

[2] Citations to "R. __" refer to the administrative record that was filed with the Commissioner's Answer. Dkt. 12.

[3] Plaintiff alleges in the complaint that QEB's disability began on January 2010.  Compl. ¶ 5 (Dkt. 2).

**B.**     <u>**Evidence in the Administrative Record**</u>

**1.**     <u>**2007 Evaluations**</u>

On February 13, 2007, QEB was evaluated by a speech and language pathologist. He was assessed as presenting "moderate dysfluency disorder" with "mildly defective" articulation. R. 125. Speech-language therapy was recommended twice per week in a small group setting. R. 125. The report indicates, among other things, that QEB was "energetic" and "friendly," "easily adjusted" to the testing environment, "interacted" with the examiner, and exhibited "age appropriate play skills," but that he was also distracted and demonstrated "extremely poor listening and attending behavior." R. 124.

On May 11, 2007, QEB underwent a psychological evaluation. R. 126–28. The examiner's report noted, among other things, that the child frequently required direction, was often "noncompliant" and "easily frustrated," used aggressive themes in his storytelling, and played aggressively. R. 126–27. She recommended, *inter alia*, play therapy and "intensive" physical activity. R. 128.

**2.**     <u>***Medical and Educational Records Submitted to the ALJ***</u>

**i.**     <u>**Consultative Examination Reports**</u>

QEB was referred to Industrial Medicine Associates by the Division of Disability Determination for consultative psychiatric and pediatric evaluations. R. 149–56. In a February 28, 2011 psychiatric evaluative report, Plaintiff described QEB with such behavioral problems as easily losing his temper; easily getting distracted; easily getting annoyed; deliberately annoying others; deliberately acting destructive; and aggression. R. 149. She reported that QEB has difficulty finishing school work and paying attention. R. 149. The examiner, Herb Meadow,

3

M.D., found that QE: had a cooperative demeanor; was "well groomed;" exhibited normal motor behavior; had a fair overall intelligibility of speech; was "coherent and goal oriented" in his thought processes; presented in a neutral mood; could add and subtract single digit numbers but could not compute "serial 3s from 20;" had intact recent and remote memory skills because he could "repeat 3 out of 3 objects immediately" but "none after five minutes," and could "repeat 4 numbers forward and backward;" had "low average" cognitive functioning with a "somewhat limited" general fund of information; had age appropriate insight and judgment; took care of his personal hygiene at home; "helps out with chores;" and socializes with friends and family.  R. 150–51.  Dr. Meadow diagnosed QEB with attention deficit hyper activity disorder.  R. 151.  He concluded, however, that QEB's diagnosis did not "appear to be significant enough to interfere with [his] ability to function on a daily basis."  R. 151.

QEB was referred for a consultative pediatric examination on February 28, 2011.  Dr. William Lathan's report noted that QEB was in good physical health and presented with "normal" behavior and speech for his age.  R. 154.  He observed that QEB "appear[ed] to have a normal attention span for [his] age."  R. 154.  His prognosis was "stable" and the doctor concluded that QEB "can participate fully in all age-appropriate education, social and recreational activities."  R. 155.

State agency examiner M. Puttanniah reviewed the consultative reports from Drs. Meadow and Lathan and completed a Childhood Disability Evaluation Form on March 24, 2011. She determined that QEB had "no limitation" with respect to the "moving about and

manipulating objects" functional domain.[4]  R. 160.  She found that QEB had a "less than

marked" limitation in the "acquiring and using information" domain due to his enrollment in first

grade without special services, his appropriate language skills, and his ability to add and subtract

single digit numbers.  R. 159.  She found that QEB had a "less than marked limitation in the

"attending and completing tasks" domain because he could repeat objects immediately but none

after five minutes and could repeat numbers forward and backward, and because Dr. Lathan

found that he had a normal attention span for his age.  R. 159.  She found that QEB had a "less

than marked" limitation with respect to the "interacting and relating with others" domain because

he was "cooperative" during Dr. Meadow's consultation, had appropriate eye contact and fairly

intelligibile speech, because Dr. Lathan determined that his behavior and speech were normal for

his age, and because Plaintiff stated that QEB will play with others but also gets into fights.  R.

159.  Puttanniah found that QEB had a "less than marked" limitation with respect to the "caring

for yourself" domain because his mother stated that he independently grooms and cleans himself

but will sometimes throw temper tantrums.  R. 160.  Finally, she found that QEB had a "less than

marked" limitation with respect to the "health and physical well-being" domain because his

mother reported that QEB frequently urinates on himself.  R. 160.  Puttanniah concluded that

QEB's ADHD impairment "is severe, but does not meet, medically equal, or functionally equal

the listings" from 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 157, 161.

### ii.    Emergency Room Records and Therapy Progress Notes

---

[4] As discussed below, there are six categories of domains that are relevant to determining whether a claimant's impairment functionally equals an impairment that is listed in the Social Security Regulations.  If a claimant's impairment functionally equals a listed impairment, the claimant will be considered disabled for purposes of the Act.

After the consultative examinations were completed, QEB decompensated and spent a night in the hospital emergency room for suicidal ideation. Thereafter, he began attending weekly therapy sessions. Records from Harlem Hospital indicate that on May 26, 2011, QEB presented to the emergency room with "suicidal thoughts and intermittent auditory hallucinations." R. 170, 218–78. The records state that QEB complained he had "nothing to leave [*sic*] for because 'life is boring[ ], there is nothing to do,'" and wakes up frequently with nightmares at night. R. 252. The notes also state, among other things, that QEB was "very restless" during the examination and "superficially cooperative." R. 253. QEB was discharged from the hospital the next day after receiving a positive re-evaluation and began attending weekly play psychotherapy sessions. R. 171, 275–76, 341–82.

Among other things, QEB's primary therapist, Elsie Y. Bermudez Pouchard, M.D. noted that the child's behavior improved after several weeks of therapy. R. 362. She diagnosed him with oppositional defiance disorder and an unspecified mood disorder. R. 170. Progress notes dated July 1, 2011 note that QEB presented as shy, was in an "ok" mood with appropriate affect and no suicide ideation, and had logical and goal-directed thought processes without delusion. R. 343. He was diagnosed with unspecified episodic mood disorder and ADHD. R. 343. Progress notes dated July 13, 2011 report that QEB was expelled from summer camp after getting into physical and verbal altercations with other children. R. 345. QEB explained that he "easily gets bored and feels irritable at times." R. 345. The doctor noted that QEB "appeared oppositional and mad at the beginning of the interview, "[l]ater on became happy and enthusiastic," and "was hyperactive and easily distracted." R. 345. The notes state that stimulant

medication were being considered for QEB's symptoms of hyperactivity, attention problems, and poor impulse control.  R. 346.

Progress notes dated July 21, 2011 state that QEB presented with good hygiene and related well with the physician, was demanding at times but was able to follow rules and accept limits.  R. 351.  The doctor observed that QEB's psychomotor activity was high and he had difficulty staying in his seat.  R. 351.  He was diagnosed with unspecified episodic mood disorder and social maladjustment due to his parents' divorce and infrequent visits from his father.  R. 350–51.  On August 3, 2011, QEB told the doctor that "he feels angry most part of the days" and "cannot control himself."  R. 353.  The doctor observed that QEB had a low tolerance for frustration, and got angry and loud after losing a board game.  R. 353.  Plaintiff reported that QEB had been cutting himself, or picking at his skin until it bled.  R. 353.  She stated that she thought he had auditory hallucinations because he often asks her why she calls him when she is not doing so.  R. 353.  The doctor observed QEB as demanding, unable to follow rules, in an angry mood, and exhibiting increased psychomotor activity.  R. 354.  He was diagnosed with unspecified episodic mood disorder and social maladjustment.  R. 354.  Again, the notes state that medication was being considered.  R. 354.

Progress notes dated August 10, 2011 state that QEB stopped picking his skin but did not want to discuss his feelings and appeared easily annoyed.  R. 356.  QEB "appeared in good spirits" at his therapy session on August 17, 2011.  R. 358.  The next week, QEB's mother reported that he had an "episode of intense emotions."  R. 360.  QEB explained that he cried a lot because he was sad and missed his father.  R. 360.  Progress notes dated September 2, 2011 state that since QEB has participated in play therapy, he is able to verbalize his feels and has

7

progressed.  R. 362.  However, the mother reported that QEB told his father that his ten year-old stepbrother was sexually abusing him.  R. 362.  She also reported that QEB told her that a seven year-old son of his father's co-worker sexually abused him as well.  R. 362–64.  QEB described these events to the therapist.  R. 362–63.  Among other things, the notes reflect that the doctors were still in the process of considering medication for QEB at this time.  R. 364.

Progress notes dated September 9, 2011 state that QEB's father spoke with the doctor about the reported sexual abuse.  R. 366.  QEB was able to follow the doctor's directions, but got anxious when an activity involved the use of his cognitive skills.  R. 366–67.  On September 16, 2011, QEB's mother reported that QEB had been sent to a behavioral counselor at school because he would not listen to his teacher.  R. 368.  The doctor again noted that QEB got easily frustrated during the session when engaged in activities requiring cognition skills.  R. 368.  However, he presented happy and was less hyperactive than in previous sessions.  R. 368.  Progress notes dated October 21, 2011 state that QEB told the doctor that "school is fun and he likes his peers."  R. 374.  However, he also expressed homicidal ideation toward his stepbrother.  R. 374.  He presented happy and enthusiastic at the beginning of the therapy session, but became frustrated and angry.  R. 375.  He was less hyperactive than in the past.  R. 375.  The attending doctor noted in the report that QEB "has been doing well overall."  R. 375.

Progress notes dated December 16, 2011 report that QEB missed a month of therapy due to insurance problems.  R. 377.  Plaintiff told an attending physician that QEB expressed suicidal ideation.  R. 298, 377.  The notes add that QEB stated he became frustrated at school after his teacher complained about his behavior and that he told her he wanted to die.  R. 298, 377.  On December 21, 2011, Plaintiff brought QEB's behavior reports from school to the therapy session.

8

R. 379.  The doctor's progress notes state that on October 27, 2011, QEB knocked over his chair, stormed around the classroom, and screamed at his teacher.  R. 379.  This behavior report also appears in the administrative record.  R. 392.  On December 19, 2011, QEB refused to follow directions, ignored his teacher, ripped up his homework, poked himself with a pencil, and swung his arms and body in such a way as to knock into walls, chairs, and a doorway.  R. 379.  The December 21, 2011 therapy progress notes also state that QEB's teacher completed a SNAP assessment form that showed "minimal symptoms of hyperactivity and impulsiveness."  R. 380.

Progress notes dated December 23, 2011 and January 19, 2012 report that QEB was recently suspended from school for slamming his desk shut, verbally disrespecting his teacher, and purposely breaking pencils.  R. 311, 382.  During his January 19, 2012 therapy session, QEB "seemed very upset," told his therapist that he "hates his father and does not want to stay with him" after his father took away his video game and television privileges, and denied being the victim of any abuse.  R. 311.  January 23, 2012 progress notes state that QEB's mother reported that her son's behavior worsened over the past few months while his aggressiveness increased, and that therapy has had "little improvement" on his behavior.  R. 314.  The therapist reported that QEB, however, appeared well-related, cooperative, and pro-social, with a "happy" mood and full-range affect.  R. 314–15.  QEB was diagnosed with an unspecified episodic mood disorder, anxiety disorder, and ADHD.  R. 334–35.  The progress notes also indicate that the therapist called QEB's school and spoke with his behavior specialist.  R. 315–17.  The specialist reported that QEB "appears more sad, depressed, has been aggressive towards objects, slams doors, is defiant, bangs his hands on the desk, bangs against walls, gets out of class."  R. 317.  A school behavior report dated January 24, 2012 states that QEB negatively reacted to a behavior

reprimand, and dragged his feet and bumped into bulletin boards on his way to the specialist's office.  R. 393.

A January 26, 2012 psychiatric report from QEB's primary therapist states that QEB presented with age-appropriate functions/behaviors in the areas of fine/gross motor skills, sensory abilities, communication skills, and cognitive skills.  R. 168.  However, his social/emotional skills were inappropriate due to "poor coping" mechanisms and "temper tantrums."  R. 169.  Dr. Bermudez noted that QEB has "good hygiene and grooming;" has "no dismorphic features;" was "cooperative and well related;" has clear speech; has a "coherent thought process" that was "goal directed;" has an "irritable" mood "at times when he does not get his way;" has a "short attention" span "at times;" was "alert" and "oriented;" and has good memory but with "limited" insight and judgment."  R. 170–71.  She noted that after six months of play therapy,

> [QEB] has presented with oppositional behavior at school and at home that has been exacerbating for the past month resulting in school suspensions. [QEB] struggles with the fact that his parents are separated.  He would become aggressive and disruptive, throwing temper tantrums when he is not pleased by his mother or teachers. [QEB] has been able to engaged [*sic*] in play therapy. He relates pretty well with therapists.  He has not verbalized any current suicidal/homicidal ideation.

R. 171.  Dr. Bermudez recommended that the child's school develop an individualized education plan ("IEP") and that he attend family therapy sessions.  R. 172.

### iii.    Administrative Hearing Testimony

Plaintiff testified at a January 13, 2012 hearing before Administrative Law Judge ("ALJ") Sean P. Walsh.  R. 24–34.  At that time, QEB was in second grade.  R. 28.  Plaintiff testified that QEB was held back and repeated first grade.  R. 28.  She reported that her son was not in a special education program or on medication, but testified that the school was "in the process of

putting him" into one and that she was "talking with" the school psychiatrist and QEB's doctors about placing him on medication. R. 28–29, 31–32, 33.  Among other things, she described QEB as angry, moody, and unable to concentrate on school work. R. 30.  She testified that QEB intentionally hurts himself, throws tantrums, and displays anger and rage over minor matters. R. 30.

### 3.    *Medical and Educational Records Submitted Directly to Appeals Council*

In May 2012, QEB was hospitalized for five days for homicidal ideation after he stated he wanted to kill his mother. R. 410.  QEB was referred to the New York City Department of Education for an educational evaluation. R. 114.  The Department's May 17, 2012 social history report stated that QEB was currently repeating second grade. R. 115–16.  The report also noted that QEB was taking the prescription drug Clonidine. R. 116.  Plaintiff informed a local Social Security office on June 29, 2012 that QEB was taking Ritalin. R. 112, 418, 28–29, 31–32, 410.

Several "SNAP-IV Teacher Parent Rating Scale" forms, dated June 5, 2012, were completed by QEB's teachers at the end of his second grade school year. R. 398–403.  The forms indicate, among other things, that QEB gets distracted easily; interrupts conversations often; blurts out answers; talks excessively; has difficulty being quiet or waiting his turn; often fidgets or squirms in his seat; often runs around excessively during inappropriate situations; often fails to finish his schoolwork or follow directions; often avoids or reluctantly engages in activities requiring sustained mental effort; has difficulty sustaining his attention in task or play activities; does not seem to listen when directly spoken to; and is often forgetful in daily activities. R. 398–403.  An undated school report states that QEB was observed putting bugs and objects from an air conditioning unit into his mouth during class. R. 404.

11

QEB was referred to New York Therapy Placement Services for a psycho-educational evaluation to assess his skill levels for an IEP. R. 410. The examiner, David Singer, PhD, noted in his July 8, 2012 report that Plaintiff reported that QEB engages in dangerous behavior such as performing flips and scratching his scabs until they bleed. R. 410–11. QEB reported to Dr. Singer that "he finds school boring," enjoys playing electronic games and doing martial arts, sometimes fights with his peers at school, and gets angry with his mother. R. 411. However, he was unable to explain why he wanted to kill his mother in May. R. 411.

Dr. Singer noted that QEB appeared his stated age; was cooperative during the exam, and endured its 1.5 hour duration. R. 411. However, Dr. Singer noted that QEB's "motivation seemed to vary, sometimes striving to succeed and other times appearing to give up easily." R. 411. QEB required redirection and verbal prompts to continue taking a test. R. 411. He was assessed with a full-scale WISC-IV IQ score of 87, which is in the low average range. R. 412. He scored in the average range in verbal comprehension, the borderline range in perceptual reasoning, the high average range in working memory, and the average range in processing speed. R. 412. On the Woodcock-Johnson Tests of Achievement III, QEB scored in the above average range in letter-word identification, the average range in passage comprehension, the above average range in spelling, the average range in calculation, and the above average range in applied problems. R. 414. Dr. Singer reported that QEB "experiences turbulent emotional conflicts," "feels controlled and helpless," "does not feel that he has the means to reach out for help on his own in the interpersonal environment," needs "external supports and guidance to be able to develop coping abilities," and "would benefit from structured, peer-related recreational activities" that would "engender positive relationships with peers and adults." R. 413.

An IEP meeting was held on October 15, 2012 when QEB was in third grade. R. 120. On December 12, 2012, an IEP was developed. R. 120–23, 425. It noted that QEB's reading and math skills were at a second grade level. R. 417, 425. He was reported to be strong in decoding and fluency, but often did not use details from the text to support his answers. R. 417. It reported that his teachers thought he had difficulty re-telling information due to his struggle to maintain focus for sustained periods of time. R. 417. The IEP also found that QEB's math skills were inconsistent. R. 417. He excelled at addition and general computation and had a strong understanding of number sense and place value, but he struggled with subtraction, multiplication, shading, and writing mixed fractions. R. 417. The report stated that his behavior problems were affecting his ability to build upon the math skills learned in earlier grades. R. 417. With respect to writing skills, the IEP noted that QEB often fails to turn in assignments but that when he does, they exhibit creative thought. R. 417. The IEP also noted that QEB has "difficulty controlling his body movements;" "is very impulsive;" "thrives off of personal attention and conversations;" "is easily distracted;" "struggles to engage in the whole class setting;" and "is often off-track and requires frequent redirection." R. 418. The report states that QEB is "fully capable of completing the academic work expected of him," but that his defiant behavior may cause him to fall behind academically. R. 418.

The IEP reported that QEB's social development skills were mixed: he was often defiant and disrespectful to adults, engaged in "negative self-talk," and fell asleep often at his desk; but he was also "very enthusiastic and participatory" when in a positive mood. R. 418. The report states that his teachers were "extremely concerned" that his behavior problems interfered with his ability to participate and learn in a classroom setting, and it described him as a "major distraction

to the functioning of the classroom."  R. 418–19.  It noted that he "has missed significant amounts of school due to his behavior," including "4 suspensions, 4 early dismissals because of behavior, 4 absences, and 10 tardies."  R. 418.  The IEP listed several goals, including "verbally indentify[ing] feelings of frustration;" "remain[ing] in the class for the entire length of each class period;" and "comply[ing] with classroom rules and any teacher directives without the display of inappropriate frustrations."  R. 420.  It recommended a special education program with services provided outside the general classroom, counseling, and testing modifications.  R. 123, 421–24.

C.      **Administrative Decisions**

On March 28, 2011, the Social Security Administration denied Plaintiff's application for SSI.  R. 35, 36–39.  Specifically, the SSA found that QEB's condition did "not cause marked and severe functional limitations."  R. 39.

Plaintiff requested a hearing before an ALJ.  R. 40–43.  A hearing was held on January 13, 2012.  R. 24–34.  By decision dated April 27, 2012, the ALJ denied Plaintiff's claim for benefits.  R. 7–23.

Plaintiff requested review of the ALJ's decision and the Appeals Council denied the request for review on July 3, 2013.  R. 1–6.  The ALJ's April 27, 2012 decision is therefore the final decision of the Commissioner and subject to review in this action.

## III. DISCUSSION

A.      **Legal Standards**

1.      ***Standard of Federal District Court Review***

Section 405(g) of Title 42 of the United States Code entitles a Social Security claimant to seek judicial review of the Commissioner's final decision denying such a claimant's application

14

for benefits.  District courts are empowered "to enter, upon the pleadings and transcript of the
record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social
Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In
reviewing the Commissioner's decision, a district court's determination is limited to whether (1)
the Commissioner applied the correct legal standard and (2) the Commissioner's decision is
supported by substantial evidence.  See Poupore v. Astrue, 566 F.3d 303, 305 (2d Cir. 2009);
Brown v. Apfel, 174 F.3d 59, 61–62 (2d Cir. 1999).

### 2.   *New Evidence Submitted to Appeals Council*

Where additional information is generated after the date that of ALJ's decision and
submitted directly to the Appeals Council, the Appeals Council must consider the new evidence
"only if (1) the evidence is material, (2) the evidence relates to the period on or before the ALJ's
hearing decision, and (3) the Appeals Council finds that the ALJ's decision is contrary to the
weight of the evidence, including the new evidence." Rutkowski v. Astrue, 368 F. App'x 226,
229 (2d Cir. 2010); see 20 C.F.R. §§ 404.970(b)(, 416.1470(b).   This new evidence submitted to
the Appeals Council "becomes part of the administrative record for judicial review." Perez v.
Chater, 77 F.3d 41, 45 (2d Cir. 1996).  The Appeals Council must then "'evaluate the entire
record including the new and material evidence submitted . . . [and] review the case if it finds
that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently
of record.'" Id. (quoting 20 C.F.R. § 404.970(b)).  New evidence is material and will relate to
the appropriate time period where it is (1) "relevant to the claimant's condition during the time
period for which benefits where denied," (2) "probative," and (3) "a reasonable possibility
[exists] that the new evidence would have influenced the [Commissioner] to decide claimant's

application differently." Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004) (internal citation omitted). Where "the Appeals Council denies review after considering new evidence," the court must "review the entire administrative record, which includes the new evidence, and determine . . . whether there is substantial evidence to support the decision of the [Commissioner]." Perez, 77 F.3d at 46.

### 3.   *Substantial Evidence*

"In determining whether the agency's findings are supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (quoting Mongeur, 722 F.2d at 1038). Substantial evidence is "'more than a mere scintilla'" and "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The substantial evidence standard is "very deferential," and the ALJ's findings of fact may not be disturbed unless "a reasonable factfinder would have to conclude otherwise." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis omitted). "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999).

### 4.   *Determination of Childhood Disability*

To qualify for SSI benefits under the Act, a claimant must demonstrate that (1) his or her income and assets (including those from parents) do not exceed a certain threshold, and (2) he or she is disabled. 42 U.S.C. § 1382(a)(1). An individual under age eighteen (*i.e.*, a "child") is

statutorily disabled under the Act if he or she has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(A)(3)(C)(i). "[A] physical or mental impairment is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 1382c(a)(3)(D).

To determine whether a child is disabled, the ALJ must employ a three-step analysis. 20 C.F.R. § 416.924(a). At step one, the ALJ must "consider[ ] whether the claimant is currently engaged in substantial gainful activity." Id. § 416.924(b). If the child is not engaged in such activity, then the ALJ must proceed to step two and "consider[ ] whether the claimant has a 'severe' physical or mental impairment or combination of impairments." Id. § 416.924(c). If the impairment or combination of impairments is severe, then the ALJ must proceed to step three and "determine whether it 'meets, medically equals, or functionally equals' an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1" (the "Listings"). Id. § 416.924(d).

Under step three, a claimant's impairment will "meet" a listed impairment if it "satisfies all of the criteria of the listing." Id. § 416.925(d). A claimant's impairment will "medically equal" a listed impairment if it is described in the Listings, the claimant does not meet the findings required in the Listings, but the claimant has "other findings related to [the] impairment that are at least of equal medical significance to the required criteria;" or if the impairment or combination of impairments is not described in the Listings but is comparable to "closely analogous listed impairments." Id. § 416.926(1)(i–ii), (2), (3).

17

An impairment will "functionally equal" a listed impairment if it "result[s] in 'marked' limitations in two domains of functioning" or in an "'extreme' limitation in one domain" of functioning.  Id. App'x 1 § 12.00(A), (C); id. § 416.926a.  The six domains of functioning are: "(i) [a]cquiring and using information; (ii) [a]ttending and completing tasks; (iii) [i]nteracting and relating with others; (iv) [m]oving about and manipulating objects; (v) [c]aring for yourself; and, (vi) [h]ealth and physical well-being."  Id. § 416.926a(b)(i)–(iv).

A "marked" limitation occurs where the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities," and "is 'more than moderate' but 'less than extreme.'"  Id. § 416.926a(e)(2)(i).  An "extreme" limitation occurs where the impairment "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete daily activities," and "is 'more than marked.'"  Id. § 416.926a(e)(3)(i).

**B.    Analysis**

The Commissioner argues that the final decision in this matter reflects the correct legal standard and is supported by substantial evidence.  Plaintiff has not responded to the Commissioner's motion.

### 1.    *The ALJ Applied the Correct Legal Test*

The record in this case reveals that the ALJ applied the correct three-step legal analysis set forth by the Regulations. R. 11–20; 20 C.F.R. § 416.924(a).  At step one, the ALJ found that QEB had not engaged in substantial gainful activity since December 21, 2010, the date that Plaintiff's application for benefits was filed. R. 13 (citing 20 C.F.R. §§ 416.924(b) and 416.971 *et seq.*).  At step two, the ALJ determined that QEB suffered from the following severe

impairments: attention deficit hyperactivity disorder and oppositional defiant disorder. R. 13 (citing 20 § C.F.R. 416.924(c)). At step three, the ALJ found that QEB's impairments, either individually or combined, did not meet, medically equal, or functionally equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 13 (citing 20 C.F.R. §§ 416.924, 416.924(d), 416.925, 416.926, 416.926a). The ALJ concluded that QEB is not disabled as defined by the Act.

Accordingly, the ALJ applied the correct legal test to evaluate QEB's claim.

### 2. *Substantial Evidence Supports the ALJ's Determinations that QEB's Impairments Do Not Meet or Medically Equal a Listed Impairment*

The ALJ found in favor of QEB with respect to steps one and two of the three-step analysis. Accordingly, the next issue is whether the ALJ's determination at step three that QEB's severe impairments do not meet or medically equal a listed impairment is supported by substantial evidence in the record. I conclude that it does.

The ALJ's decision states that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." R. 13. Although the decision goes on to explain the ALJ's other determination that QEB's impairments do not functionally equal the severity of a listed impairment, R. 13–20, it does not contain a specific analysis with respect to the determination that QEB's impairments do not meet or medically equal a listed impairment. "In general, an ALJ's determination 'must contain a sufficient explanation of his reasoning to permit the reviewing court to judge the adequacy of his conclusions.' However, if 'the referenced medical evidence, together with [a] lack of compelling contradictory evidence from the plaintiff' constitute substantial evidence, the ALJ's determination should be upheld." Sava v.

Astrue, No. 06 Civ. 3386(KMK)(GAY), 2010 WL 3219311, at *3 (S.D.N.Y. Aug. 12, 2010)

(quoting Cruz v. Astrue, No. 06 Civ. 3670(LTS)(DCF), 2009 WL 1024242, at *11 (S.D.N.Y.

Apr. 9, 2009) and Otts v. Comm'r of Soc. Sec., 249 F. App'x 887, 889 (2d Cir. 2007)).

      The record indicates that QEB has been diagnosed with attention deficit hyperactivity

disorder, oppositional defiance disorder, an unspecified episodic mood disorder, and social

maladjustment.  The Listings include childhood mental impairments for attention deficit

hyperactivity disorder, personality disorders, and mood disorders.  To meet or medically equal

the listed impairment of attention deficit hyperactivity disorder, the claimant's impairment must

be:

> Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.  The required level of severity for these disorders is met when the requirements in both [paragraphs] A and B are satisfied.
> A.     Medically documented findings of all three of the following:
>> 1.     Marked inattention; and
>> 2.     Marked impulsiveness; and
>> 3.     Marked hyperactivity;
> AND
> B.     . . . [F]or children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of [Section] 112.02.

Id. App. 1 § 112.11.  To meet or medically equal the listed impairment of a personality disorder,

the claimant's impairment must be:

> Manifested by pervasive, inflexible, and maladaptive personality traits, which are typical of the child's long-term functioning and not limited to discrete episodes of illness.  The required level of severity for these disorders is met when the requirements in both [paragraphs] A and B are satisfied.
> A.     Deeply ingrained, maladaptive patterns of behavior, associated with one of the following:
>> 1.     Seclusiveness or autistic thinking; or
>> 2.     Pathologically inappropriate suspiciousness or hostility; or
>> 3.     Oddities of thought, perception, speech, and behavior; or
>> 4.     Persistent disturbances of mood or affect; or
>> 5.     Pathological dependence, passivity, or aggressiveness; or

6.    Intense and unstable interpersonal relationships and impulsive and exploitative behavior; or

7.    Pathological perfectionism and inflexibility;

AND

B.    . . . [F]or children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of [Section] 112.02.

Id. App. 1, § 112.08.  To meet or medically equal the listed impairment of a mood disorder, the claimant's impairment must be:

Characterized by a disturbance of mood (referring to a prolonged emotion that colors the whole psychic life, generally involving either depression or elation), accompanied by a full or partial manic or depressive syndrome.  The required level of severity for these disorders is met when the requirements in both [paragraphs] A and B are satisfied.

A.    Medically documented persistence, either continuous or intermittent, of one of the following:

1.    Major depressive syndrome, characterized by at least five of the following, which must include either depressed or irritable mood or markedly diminished interest or pleasure:

a.    Depressed or irritable mood; or

b.    Markedly diminished interest or pleasure in almost all activities; or

c.    Appetite or weight increase or decrease, or failure to make expected weight gains; or

d.    Sleep disturbance; or

e.    Psychomotor agitation or retardation; or

f.    Fatigue or loss of energy; or

g.    Feelings of worthlessness or guilt; or

h.    Difficulty thinking or concentrating; or

i.    Suicidal thoughts or acts; or

j.    Hallucinations, delusions, or paranoid thinking;

OR

2.    Manic syndrome, characterized by elevated, expansive, or irritable mood, and at least three of the following:

a.    Increased activity or psychomotor agitation; or

b.    Increased talkativeness or pressure of speech; or

c.    Flight of ideas or subjectively experienced racing thoughts; or

d.    Inflated self-esteem or grandiosity; or

e.    Decreased need for sleep; or

f.    Easy distractibility; or

g.    Involvement in activities that have a high potential of painful consequences which are not recognized; or

21

h.   Hallucinations, delusions, or paranoid thinking;

OR

3.   Bipolar or cyclothymic syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently or most recently characterized by the full or partial symptomatic picture of either or both syndromes);

AND

B.   . . . [F]or children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of [Section] 112.02.

Id. App. 1, § 112.04.

Paragraph B2 of Section 112.02 includes the following criteria:

a.   Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests . . . ; or

b.   Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c.   Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d.   Marked difficulties in maintaining concentration, persistence, or pace.

Id. App. 1, § 112.02(b)(2).

Here, although the record indicates that QEB has difficulties maintaining concentration, persistence, or pace, and that he exhibits certain cognitive, social, and personal functioning problems, the record does not indicate that his functioning problems are age "inappropriate" as required by Paragraph B2.  For instance, QEB's treating therapist, Dr. Bermudez, noted that, as of January 2012, QEB presented with age-appropriate functions and behaviors with respect to his

22

motor skills, sensory abilities, communication skills, and cognitive skills.  She also noted good

hygiene, cooperative behavior, related well with her, clear and coherent speech, and full-range

affect.  The consultative psychiatric examiner, Dr. Meadow, also found that QEB presented with

age-appropriate functions and behaviors with respect to his mental status, manner of relating with

others, appearance, communicability, insight, and judgment.  Although he noted that QEB's

examination appeared consistent with psychiatric problems and he diagnosed the child with

ADHD, Dr. Meadow determined that those problems did not appear to significantly interfere

with QEB's ability to function on a daily basis, and he concluded that QEB can perform all tasks

necessary for daily functioning.  The consultative pediatric examiner, Dr. Lathan, determined that

QEB presented with age-appropriate behaviors, relations with others, speech, and attention span,

and he concluded that QEB could fully participate in all educational, social, and recreational

activities along with his peers.

Accordingly, the physicians' findings do not indicate that QEB's impairments resulted in

two of the "marked" difficulties required by Paragraph B2.  Moreover, Plaintiff has not pointed

to compelling, contradictory evidence in the record that establishes that QEB's impairments meet

or medically equal a listed impairment.  The Commissioner's decision is therefore supported by

substantial evidence in the record.

   **3.**   ***Substantial Evidence Does Not Support the ALJ's Determinations that QEB's
            Impairments Do Not Functionally Equal a Listed Impairment***

The ALJ determined that QEB's impairments did not functionally equal a listed

impairment.  In making this determination, the ALJ analyzed the correct six-domain criteria

required by the Regulations and considered both the medical and non-medical evidence in the

record. However, I conclude that the Commissioner's final decision is not supported by

substantial evidence.

First, the domain of "acquiring and using information" involves "how well [a child]

acquire[s] or learn[s] information, and how well [the child] use[s] the information [he or she has]

learned. 20 C.F.R. § 416.926a(g). The Regulations state that for school-aged children attending

elementary school,

> [Y]ou should be able to learn to read, write, and do math, and discuss history
> and science. You will need to use these skills in academic situations to demonstrate
> what you have learned; e.g., by reading about various subjects and producing oral and
> written projects, solving mathematical problems, taking achievement tests, doing
> group work, and entering into class discussions. You will also need to use these
> skills in daily living situations at home and in the community (e.g., reading street
> signs, telling time, and making change). You should be able to use increasingly
> complex language (vocabulary and grammar) to share information and ideas with
> individuals or groups, by asking questions and expressing your own ideas, and by
> understanding and responding to the opinions of others.

Id. § 416.926a(g)(2)(iv).

Here, the ALJ determined that QEB had "no limitation" in this domain and found that,

"[a]lthough the claimant's mother voiced her concern regarding the claimant's academic

achievements, there is nothing in the record to suggest that the claimant's behavioral issues in

any way have affected the claimant's academic performance. The school reports address the

claimant's behavior only." R. 16–17. This is not supported by the record. The record indicates

that QEB was held back and repeated grades.[5] This information is clearly relevant for purposes

of assessing the child's ability to acquire, learn, and use information. See 20 C.F.R. §

416.926a(e)(1)(i) (determination of whether a limitation is either "marked" or "extreme" requires

---

[5] As discussed above, Plaintiff testified at the administrative hearing that QEB repeated
first grade. The New York City Department of Education subsequently reported that QEB
repeated second grade.

consideration of "all the relevant information in [a claimant's] case record that helps . . . .determine [his or her] functioning"). Moreover, although the ALJ did not have the benefit of QEB's school records at the time of his decision, the record is now replete with instances where QEB's behavior problems affected his performance in school, including repeating grades, suspensions, and concerns from school staff. Records also note that QEB was placed on medication for his attention deficit hyperactivity disorder and that an IEP was developed that removed him from general education classes.

Second, the domain of "attending and completing tasks" involves "how well [a child is] able to focus and maintain . . . attention, and how well [a child] begin[s], carr[ies] through, and finish[es] . . . activities, including the pace at which [a child] perform[s] activities and the ease with which [he or she] change[s] them." 20 C.F.R. § 416.926a(h). The Regulations state that for school-age children attending elementary school,

> [Y]ou should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

Id. § 416.926a(h)(2)(iv).

Here, the ALJ determined that QEB had a "less than marked limitation in attending and completing tasks," and found that "[a]lthough the claimant's hyperactive and oppositional behavior affects his ability to stay on tasks and complete assignments, the claimant apparently

25

does well in school. *He has never been held back a grade.* He does not receive any ancillary services that would suggest a serious problems [*sic*] in this functioning domain." R. 17 (emphasis added). Again, this is not supported by the record. The record now shows that QEB repeated grades, that school staff expressed concerns over his academic progress, that he has an IEP which specifically calls for special education, counseling services, and testing accommodations, that he regularly attends therapy, and that he is taking prescription medication to control his behavior.

Third, the domain of "interacting and relating with others" involves "how well [a child] initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s] the language of [his or her] community, cooperate[s] with others, compl[ies] with rules, respond[s] to criticism, and respect[s] and take[s] care of the possessions of others." 20 C.F.R. § 416.926a(I). The Regulations state that for school-age children attending elementary school,

> [Y]ou should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

Id. § 416.926a(i)(2)(iv).

Here, the ALJ determined that QEB had a "less than marked limitation in interacting and relating with others." He found that: "The claimant has had difficulty controlling his temper and has exhibited aggressive and defiant behavior towards his family members, his peers, and the teachers. The treatment records from [Dr. Bermudez] suggest that the claimant has responded well to play therapy and has been learning to modulate his mood." R. 18. However, the record shows that one month after the ALJ issued his decision, QEB decompensated and was

26

hospitalized for five days for homicidal ideation.  In addition, many of the materials that were

sent directly to the Appeals Council reflect QEB's inability to behave in a classroom situation.

Indeed, the December 2012 IEP found that QEB required a smaller class setting and removed

him from regular education for this reason.

Because much of the information relevant to analyzing QEB's limitations with respect to

these domains was unavailable to the ALJ before he issued his decision and was submitted

directly to the Appeals Council, "'the appropriate inquiry is not whether the ALJ should have

considered [this new evidence], but rather whether it should have compelled review by the

Appeals Council.'"  Guile v. Barnhart, No. 07 Civ. 259(GLS), 2010 WL 2516586, at *2

(N.D.N.Y. June 14, 2010) (quotation omitted); see Rutkowski, 368 F. App'x, at 229; Perez, 77

F.3d at 45–46; 20 C.F.R. §§ 404.970(b), 416.1470(b).  The Appeals Council must consider the

new evidence only if it is "material" and "relates to the period on or before the ALJ's hearing

decision," Rutkowski, 368 F. App'x at 229.  Here, the new evidence is clearly material because it

relates to three out of the six domains of functions.  It also relates to the appropriate period of

time.  For instance, although QEB was prescribed medication and removed from general

education *after* the ALJ issued his decision, the record indicates that these efforts were under

consideration during the time period reviewed by the ALJ and the period for which benefits are

sought.  Compare Guile, 2010 WL 2516586, at *2 (where new evidence provided "only a

snapshot of [plaintiff]'s condition several months after the ALJ's decision," and did not "offer

any retrospective opinion as to [plaintiff]'s condition during the relevant period," new evidence

was not relevant).  Moreover, "a reasonable possibility" exists that the ALJ's decision would

have been different had the new information regarding medication and special education, among

other things, been available to him at the time of his decision.  Pollard, 377 F.3d at 193.

Accordingly, because the Commissioner's final decision fails to sufficiently and accurately address material evidence that is relevant to the determination of QEB's functional capacity in three out of the six domains, I respectfully recommend that the case be remanded. On remand, the ALJ should specifically assess the evidence concerning QEB's decompensation and hospitalization, medication, repetition of grades, teacher evaluations and recommendations, and IEP and removal from general education.

## IV.  CONCLUSION

For the reasons set forth above, I respectfully recommend that Defendant's motion for judgment on the pleadings be **DENIED** and that the case be **REMANDED** for further administrative proceedings consistent with this Report & Recommendation pursuant to 42 U.S.C. § 405(g), sentence four.

Dated: August 28, 2014
       White Plains, New York

Respectfully submitted,

Paul E. Davison
United States Magistrate Judge

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days, plus an additional three (3) days, or a total of seventeen (17) days, from service of this Report and Recommendation to serve and file written objections.  See also Fed. R. Civ. P. 6(a), (b), (d).   Such objections, if any, along with

28

any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Honorable Vincent L. Briccetti, at the Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Briccetti.


A copy of this Report and Recommendation has been mailed to Plaintiff, *pro se*:

Shaniya Williams
601 E. 156th Street
Apt. 11A
Bronx, NY 10455

29